## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Tyler D. Field, being sworn, state:

### Introduction and Agent Background

1. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since March 2016. I am currently assigned to the DEA's New Bedford Resident Office. I was previously assigned to the Providence District Office, Boston Division Office and to the Cincinnati District Office. Prior to joining the DEA, I was a police officer for the town of Bridgewater, Massachusetts for more than three years. I previously served as a U.S. Army Military Police Major in the Massachusetts and Indiana Army National Guard for more than twenty years. I graduated from the U.S. Army Military Police School; Plymouth, Massachusetts Police Academy; and DEA Basic Agent Academy. I hold a Bachelor of Science in Accounting from the University of Massachusetts, Dartmouth.

3. During my time as a police officer and Special Agent, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses

who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the way illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the way narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the way drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the way drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. I have received advanced training and certifications in the extraction of data from mobile devices Through this training and experience, I have learned that drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular

telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the street terms used by drug traffickers, as well as the methods they use to disguise conversation and operations.

## Purpose of Affidavit

6. I submit this affidavit in support of an application for a criminal complaint against Jairo Collazo ("COLLAZO"), a/k/a "Piquete," charging that from at least in or about October 2023 through April 12, 2024, COLLAZO conspired with other persons known and unknown to law enforcement, to knowingly and intentionally distribute and possess with intent to distribute controlled substances, that is, 400 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 (the "Target Offense").

7. I have personally participated in this investigation since October 2023. This affidavit does not set forth all the facts developed during this investigation. Rather, it sets forth only those facts that establish probable cause to believe that COLLAZO committed the Target Offense.

## Probable Cause

8. In October 2023, DEA investigators received information about an individual based in the Dominican Republic who distributes fentanyl within the northeastern United States (the "DR Target"). At investigators' direction, a DEA cooperating source (the "CS[1]") contacted

---

[1] The CS has pleaded guilty to a federal drug offense and is cooperating in the hope of receiving favorable treatment with respect to the CS's case. Information provided by the CS has led to the seizure of controlled substances, and the CS has provided information on other active DEA investigations that

the DR Target.[2] The DR Target agreed to send his New York-based associate, later identified as Jairo COLLAZO, to deliver a sample of fentanyl to the CS in Massachusetts and to discuss future fentanyl transactions.

*December 2023: COLLAZO Distributed a Sample of Fentanyl to the CS*

9. During the second week of December 2023, the CS contacted the DR Target and asked to meet with the New York associate (COLLAZO) the following day at a specified meeting location in Massachusetts.[3]

10. The following day, the CS met with COLLAZO in Boston, Massachusetts. COLLAZO provided the CS with a substance that was later tested at a DEA laboratory and determined to be 10.2 grams of a substance containing fentanyl. COLLAZO told the CS that he could provide "horse tranquilizer," which based on my training and experience was a reference to xylazine. Xylazine has recently been found mixed with fentanyl and is otherwise commonly used as a horse tranquilizer.

---

investigators corroborated. Based on the information provided in those investigations and in this one, investigators believe information provided by the CS is reliable.

[2] The CS's conversations with the DR Target and COLLAZO were via WhatsApp, which lacks a recording function. Investigators reviewed and saved text messages and voice memoranda that the CS sent and received, which existed on his/her phone. With respect to voice calls, the CS described the content of the calls and investigators confirmed the calls took place by inspecting the call log and using court-authorized WhatsApp pen registers on the targets' phones. Unless otherwise indicated, the voice calls were not made in investigators' presence.

[3] I am aware of the specific dates and locations of events described in this Affidavit but am withholding them to protect the identities of the cooperating sources.

*January 2024: COLLAZO Distributed 498.8 Grams of Fentanyl to the CS*

11.    In January 2024, investigators again directed the CS to contact the DR Target to arrange a purchase of fentanyl. The DR Target agreed to provide the CS a half-kilogram of fentanyl in exchange for $17,500.

12.    In early January 2024, the CS met with COLLAZO in Fitchburg, Massachusetts to purchase the pre-arranged half-kilogram of fentanyl. Prior to the drug transaction, investigators searched the CS for contraband and found none. During the meeting, COLLAZO provided the CS with a substance later tested at a DEA laboratory and determined to be 498.8 grams of a substance containing fentanyl. The CS paid COLLAZO a partial payment of $12,500 in official funds.

13.    Over the course of the investigation, investigators obtained location information for three cellular telephones used by COLLAZO. Using the location information, investigators determined that COLLAZO lives in Apartment 3B, 1356 Walton Street, Bronx, New York. Investigators further determined that COLLAZO frequently accesses the basement unit of 3395 Fort Independence Street in the Bronx (the "Stash Location"). Phone location information showed that COLLAZO visited the Stash Location before driving to Fitchburg to sell the CS fentanyl.

14.    In early February 2024, the CS had a three-way conference call with the DR Target and COLLAZO regarding the outstanding balance the CS owed for the half-kilogram of fentanyl. Following the call, COLLAZO initiated a video call with the CS. During the call, COLLAZO's phone was in or near the Stash Location. COLLAZO showed the CS an apartment, the Stash Location, where COLLAZO had approximately 5 bricks in a closet consistent with being kilograms of narcotics. COLLAZO also showed the CS boxes of mini glassine wax paper

baggies, two clear bottles that COLLAZO called "*manito*" and "horse tranquilizer" (believed to be xylazine). COLLAZO showed the CS approximately four people in the apartment whom he represented were his employees at his "lab." COLLAZO told the CS that COLLAZO's father, who is now in the Dominican Republic, left the "business" to COLLAZO and his brother. COLLAZO told the CS he could show the CS how to use xylazine and add it to the fentanyl. COLLAZO stated he charges "$200.00 per bottle."

15. COLLAZO told the CS that when COLLAZO met the CS in December 2023, he had just got out of jail three months before. Investigators determined that COLLAZO was charged in 2021 in Bronx County Criminal Court in connection with the seizure from his Walton Avenue apartment (Apt. 3B) of approximately four kilograms of heroin and approximately $87,091 in drug proceeds. COLLAZO was convicted in New York County Supreme Court. COLLAZO appears to have been deported and to have unlawfully returned to the United States.

16. According to phone location data, COLLAZO's phones have been located, in a manner consistent with residence, in or near Apartment 3B between January 2024 and the present.

17. On February 11, 2024, COLLAZO called the CS via WhatsApp. COLLAZO told the CS that he was travelling to Massachusetts the following day to bring "work" to Massachusetts. COLLAZO asked the CS if he/she wanted any "work." Based on my training, experience, and familiarity with this investigation, including my knowledge of the CS's communications, "work" meant fentanyl. Later that day, phone location information indicated COLLAZO spent seven hours at the Stash Location. The following day, February 12, COLLAZO added photographs/videos on his WhatsApp story displaying himself driving on the highway.

18. On February 18, 2024, COLLAZO used WhatsApp to place another video call to the CS. COLLAZO showed the CS scales, cutting materials, and a kilogram of suspected fentanyl

with a "1000% pure" label. Earlier that day, COLLAZO posted photographs and a video to his WhatsApp account that depicted large quantities of United States currency.

*April 3, 2024: COLLAZO Agreed to Sell 2 Kilograms of Fentanyl to the CS*

19. On April 3, 2024, COLLAZO sent the CS a video showing approximately five brick-shaped objects that in my training and experience appeared consistent with wrapped kilograms of narcotics. The kilograms were on a table inside what appeared to be an apartment. According to court-authorized location information, COLLAZO's phone was located near his apartment when he sent the video. During a subsequent discussion, the CS and COLLAZO agreed that COLLAZO would bring two kilograms of fentanyl, at a price of $30,000 per kilogram, and one kilogram of cutting agent to the CS in Massachusetts. On the morning of April 11, 2024, investigators saw COLLAZO entering the gate that leads down a set of stairs to Stash Location.

*April 12, 2024: Investigators Executed Search Warrants at the Stash Location and at COLLAZO's Apartment*

20. On April 11, 2024, the Hon. Sarah Netburn, Chief U.S. Magistrate Judge, U.S. District Court for the Southern District of New York, authorized warrants to search the Stash Location and COLLAZO's apartment. *See* 24-MAG-1470 (S.D.N.Y.).

21. On the morning of April 12, 2024, investigators saw COLLAZO approaching the Stash Location and detained him pending execution of the search warrant. Inside the Stash Location, investigators found a workspace for packaging and distributing fentanyl. The Stash Location contained what appeared to be thousands of baggies full of powder, which are referred to in my training and experience as "bundles." Investigators found two suitcases full of blender components; the blenders were filled with powder residue. Investigators also found what appeared to be a half-kilogram of narcotics and three bottles of xylazine. Based on my training, experience, and familiarity with this investigation, including COLLAZO's prior sales of fentanyl

7

to the CS and his recorded discussions with the CS, I believe the bundles of powder, the blender residue, and the half-kilogram will be found to contain fentanyl upon analysis.





**Conclusion**

22.     Based on the foregoing, there is probable cause to believe conclude that COLLAZO conspired with others known and unknown to law enforcement, to knowingly and intentionally distribute and possess with intent to distribute controlled substances, that is, 400 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

Respectfully submitted,

Tyler Field
Special Agent
Drug Enforcement Administration

Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on April 12, 2024.

HON. JENNIFER C. BOAL
United States Magistrate Judge